**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROSE MAURO, Individually and on Behalf of All Others Similarly Situated, ) | Case No.: |
| ) | |
| Plaintiff, ) | |
| ) | **COMPLAINT FOR VIOLATION OF** |
| v. ) | **THE FEDERAL SECURITIES LAWS** |
| ) | |
| LIBERTY TAX, INC., EDWARD L. BRUNOT, JOHN T. HEWITT, and KATHLEEN E. DONOVAN, ) | CLASS ACTION |
| ) | |
| ) | |
| Defendants. ) | **DEMAND FOR JURY TRIAL** |
| ) | |

Plaintiff Rose Mauro ("Plaintiff") individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Liberty Tax, Inc. ("Liberty Tax" or the "Company"), as well as media and analyst reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of a class of all persons and entities, other than Defendants and their affiliates, who purchased publicly traded Liberty Tax securities between June 29, 2016 and December 11, 2017, both dates inclusive ("Class Period"), seeking to recover damages caused by Defendants' violations of federal securities laws pursuant to remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## INTRODUCTION

2.    Throughout the Class Period, Defendants made a series of false and misleading statements regarding the Company's disclosure controls and procedures. For example, although Defendants told the investing public that the Company maintained effective internal controls to ensure the accuracy of its financial reporting, investors ultimately learned the opposite was true, i.e. the Company's internal controls were ineffective and did not ensure accurate financial reporting. The market learned the truth on December 11, 2017, when Liberty Tax filed a Form 8-K with the SEC announcing the sudden resignation of its independent registered public

accounting firm, and stated that the Company would delay the filing of its quarterly report on Form 10-Q for the quarter ended October 31, 2017. The market was shocked by this revelation, which caused Liberty Tax stock to react violently, losing 6.3% of its value that day.

## JURISDICTION AND VENUE

3.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

4.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

5.      Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as the Company conducts business in this judicial district.

6.      In connection with the acts, conduct and other wrongs alleged herein, Defendants either, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

7.      Plaintiff, as set forth in the attached Certification, purchased Liberty Tax securities at artificially inflated prices during the Class Period and was damaged thereby.

8.      Defendant Liberty Tax provides tax preparation services and solutions in the United States and Canada. The Company operates 212 tax offices in New York and more than 40 tax offices in this district. Liberty Tax securities trade on NASDAQ under the symbol "TAX."

9.    Defendant Edward L. Brunot ("Brunot") has been the Company's President and Chief Executive Officer ("CEO") since September 8, 2017. He previously served as Chief Operating Officer since June 1, 2017.

10.    Defendant John T. Hewitt ("Hewitt") is the Company's founder, and was its President and CEO from October 1996 until his termination on September 5, 2017. He served as the Chairman of the Board of Directors of the Company throughout the Class Period.

11.    Defendant Kathleen E. Donovan ("Donovan") served as the Company's Chief Financial Officer ("CFO") throughout the Class Period. On November 7, 2017, the Company announced Donovan's resignation, effective at a future date.

12.    Collectively, Defendants Brunot, Hewitt, and Donovan are herein referred to as the "Individual Defendants."

13.    Defendant Liberty Tax and the Individual Defendants together are herein referred to as "Defendants."

14.    Each of the Individual Defendants:

    a.    directly participated in the management of the Company;

    b.    was directly involved in the day-to-day operations of the Company at the highest levels;

    c.    was privy to confidential proprietary information concerning the Company and its business and operations;

    d.    was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e.   was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f.   was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g.   approved or ratified these statements in violation of the federal securities laws.

## SUBSTANTIVE ALLEGATIONS

**False and Misleading Statements**

15.   On June 29, 2016, Liberty Tax filed its Annual Report on Form 10-K for the fiscal year ended April 30, 2016 (the "2016 10-K") with the SEC, which provided the Company's annual financial results and position. Defendants Hewitt and Donovan signed the 2016 10-K. The 2016 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Hewitt and Donovan attesting to the accuracy of the Company's financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

16.   Concerning the Company's disclosure controls and procedures, the 2016 10-K stated as follows:

> **Item 9A.    Controls and Procedures.**
>
> The Company's disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed in the Company's reports filed under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, including, without limitation, that such information is accumulated and communicated to Company management, including the Company's principal executive and financial officer, as appropriate, to allow timely decisions regarding required disclosures.

### *Evaluation of Disclosure Controls and Procedures*

The Company, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and the Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) and 15d-15(e) under the Exchange Act) as of April 30, 2016. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that, as of April 30, 2016, the Company's disclosure controls and procedures were effective in providing reasonable assurance that material information is recorded, processed, summarized, and reported by management of the Company on a timely basis in order to comply with the Company's disclosure obligations under the Exchange Act and the rules and regulations promulgated thereunder.

### *Management's Report on Internal Control Over Financial Reporting*

Management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) and 15d-15(f) under the Exchange Act). The Company's internal control over financial reporting is designed to provide reasonable assurance to the Company's management and Board of Directors regarding the reliability of financial reporting and preparation of financial statements for external purposes in accordance with GAAP.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation.

Management assessed the effectiveness of the Company's internal control over financial reporting as of April 30, 2016. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control – Integrated Framework (2013). Based on this assessment, management believes that, as of April 30, 2016, the Company's internal control over financial reporting was effective based on those criteria.

### *Changes in Internal Control over Financial Reporting*

> During the quarter ended April 30, 2016, there were no changes that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

17.    On September 2, 2016, Liberty Tax filed its quarterly report on Form 10-Q for the quarter ended July 31, 2016 (the "Q1 2017 10-Q") with the SEC, which provided the Company's quarterly financial results and position. The Q1 2017 10-Q was signed by Defendants Hewitt and Donovan and contained signed SOX certifications from Defendants Hewitt and Donovan attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

18.    Concerning the Company's disclosure controls and procedures, the Q1 2017 10-Q stated as follows:

### ITEM 4. CONTROLS AND PROCEDURES

### *Evaluation of Disclosure Controls and Procedures*

> We, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act") as of July 31, 2016. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that, as of July 31, 2016, our disclosure controls and procedures were effective in providing reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported by our management on a timely basis in order to comply with our disclosure obligations under the Exchange Act and the rules and regulations promulgated thereunder.

19.     On December 9, 2016, Liberty Tax filed its quarterly report on Form 10-Q for the quarter ended October 31, 2016 (the "Q2 2017 10-Q") with the SEC, which provided the Company's quarterly financial results and position. The Q2 2017 10-Q was signed by Defendants Hewitt and Donovan and contained signed SOX certifications from Defendants Hewitt and Donovan attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

20.     Concerning the Company's disclosure controls and procedures, the Q2 2017 10-Q stated as follows:

### ITEM 4. CONTROLS AND PROCEDURES

#### *Evaluation of Disclosure Controls and Procedures*

We, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of October 31, 2016. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that, as of October 31, 2016, our disclosure controls and procedures were effective in providing reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported by our management on a timely basis in order to comply with our disclosure obligations under the Exchange Act and the rules and regulations promulgated thereunder.

21.     On March 9, 2017, Liberty Tax filed its quarterly report on Form 10-Q for the quarter ended January 31, 2017 (the "Q3 2017 10-Q") with the SEC, which provided the Company's quarterly financial results and position. The Q3 2017 10-Q was signed by Defendants Hewitt and Donovan and contained signed SOX certifications from Defendants

Hewitt and Donovan attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

22.    Concerning the Company's disclosure controls and procedures, the Q3 2017 10-Q stated as follows:

### ITEM 4. CONTROLS AND PROCEDURES

#### *Evaluation of Disclosure Controls and Procedures*

We, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of January 31, 2017. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that, as of January 31, 2017, our disclosure controls and procedures were effective in providing reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported by our management on a timely basis in order to comply with our disclosure obligations under the Exchange Act and the rules and regulations promulgated thereunder.

23.    On July 7, 2017, Liberty Tax filed its Annual Report on Form 10-K for the fiscal year ended April 30, 2017 (the "2017 10-K") with the SEC, which provided the Company's annual financial results and position. The 2017 10-K was signed by Defendants Hewitt and Donovan and contained signed SOX certifications by Defendants Hewitt and Donovan attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

24.    Concerning the Company's disclosure controls and procedures, the 2017 10-K stated as follows:

**Item 9A.    Controls and Procedures.**

The Company's disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed in the Company's reports filed under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, including, without limitation, that such information is accumulated and communicated to Company management, including the Company's principal executive and financial officer, as appropriate, to allow timely decisions regarding required disclosures.

***Evaluation of Disclosure Controls and Procedures***

The Company, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and the Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of April 30, 2017. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that, as of April 30, 2017, the Company's disclosure controls and procedures were effective in providing reasonable assurance that information required to be filed by the Company in the reports if files or submits under the Exchange Act is recorded, processed, summarized, and reported by management of the Company on a timely basis in order to comply with the Company's disclosure obligations under the Exchange Act and the rules and regulations promulgated thereunder.

***Management's Report on Internal Control Over Financial Reporting***

Management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act). The Company's internal control over financial reporting is designed to provide reasonable assurance to the Company's management and Board of Directors regarding the reliability of financial reporting and preparation of financial statements for external purposes in accordance with GAAP.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement

preparation and presentation. Management assessed the effectiveness of the Company's internal control over financial reporting as of April 30, 2017. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control – Integrated Framework (2013). Based on this assessment, management believes that, as of April 30, 2017, the Company's internal control over financial reporting was effective based on those criteria.

### Changes in Internal Control over Financial Reporting

During the quarter ended April 30, 2017, there were no changes that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

25. On September 11, 2017, Liberty Tax filed its quarterly report on Form 10-Q for the quarter ended July 31, 2017 (the "Q1 2018 10-Q") with the SEC, which provided the Company's quarterly financial results and position. The Q1 2018 10-Q was signed by Defendants Brunot and Donovan and contained signed SOX certifications by Defendants Brunot and Donovan attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

26. Concerning the Company's disclosure controls and procedures, the Q1 2018 10-Q stated as follows:

### ITEM 4. CONTROLS AND PROCEDURES

### Evaluation of Disclosure Controls and Procedures

We, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of July 31, 2017. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that, as of July 31, 2017,

> our disclosure controls and procedures were effective in providing reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported by our management on a timely basis in order to comply with our disclosure obligations under the Exchange Act and the rules and regulations promulgated thereunder.

27. The statements referenced in ¶¶15-26 above were materially false and/or misleading because they misrepresented the true state of affairs at Liberty Tax and failed to disclose the following adverse facts pertaining to the Company's business and operations which were known to Defendants or recklessly disregarded by them. In particular, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Liberty Tax's former CEO Defendant Hewitt created an inappropriate tone at the top of the Company which led to ineffective entity level controls over the organization; and (2) as a result, Defendants' statements about Liberty Tax's business, operations and prospects, as set forth above, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Begins to Emerge**

28. On November 7, 2017, Liberty Tax filed a Form 8-K with the SEC announcing the abrupt resignation of Defendant Donovan as its CFO.

29. On this news, shares of Liberty Tax fell $2.25 per share, or more than 16 percent, from its previous closing price to close at $11 per share on November 8, 2017, causing Plaintiff and all other members of the proposed Class damages.

30. On December 11, 2017, Liberty Tax filed a Form 8-K with the SEC announcing the sudden resignation of KPMG LLP as its independent registered public accounting firm, as well as a delay in the filing of its quarterly report on Form 10-Q for the quarter ended October 31, 2017, stating in pertinent part:

**Item 4.01. Changes in Registrants Certifying Accountant.**

On December 8, 2017, KPMG LLP ("KPMG") resigned as the independent registered public accounting firm of Liberty Tax, Inc. (the "Company"), effective immediately, and KPMG's resignation was accepted and approved by the Audit Committee of the Board of Directors of the Company (the "Board").

\*\*\*

***KPMG expressed to the Audit Committee and Company management its concern that the actions of former Chief Executive Officer John T. Hewitt, who remains the Chairman of the Board and controlling stockholder as the sole holder of the Company's outstanding Class B common stock, have created an inappropriate tone at the top which leads to ineffective entity level controls over the organization.*** Prior to the termination of Mr. Hewitt's employment as Chief Executive Officer of the Company on September 5, 2017, the Audit Committee oversaw an investigation of allegations of misconduct by Mr. Hewitt. In particular, KPMG noted that Mr. Hewitt took actions to replace two independent members of the Board around the time information relating to this investigation appeared in media reports. KPMG also noted that following the replacement by Mr. Hewitt of two Class B directors, the chair of the Audit Committee retired from the Board, the Company's Chief Financial Officer announced her intention to resign from the Company, and another independent member of the Board announced that he would not stand for reelection at the Company's next annual meeting. Further, KPMG was made aware that following his termination as Chief Executive Officer, Mr. Hewitt may have continued to interact with franchisees and area developers of the Company. ***Although Mr. Hewitt stated to KPMG during a meeting on November 9, 2017 that he would not reinsert himself into the management of the Company, in light of Mr. Hewitt's actions and his ability to control the Board as the sole holder of the Class B common stock, KPMG informed the Audit Committee and management that it has concerns regarding the Company's internal control over financial reporting as related to integrity and tone at the top and such matters should be evaluated as potential material weaknesses.***

***Specifically, KPMG informed the Audit Committee and management that Mr. Hewitt's past and continued involvement in the Company's business and operations, including his continued interactions with franchisees and area developers of***

*the Company, has led it to no longer be able to rely on management's representations, and therefore has caused KPMG to be unwilling to be associated with the Company's consolidated financial statements.* In notifying the Company of its resignation, KPMG advised the Audit Committee and management that it is not aware of any information that cause it to question the integrity of current management, but rather that the structural arrangement by which Mr. Hewitt controls the Company is the cause of KPMG's concerns. KPMG also noted that because certain information known to the Board regarding the reasons that the Board terminated Mr. Hewitt as Chief Executive Officer had not been disclosed to the current Chief Executive Officer and Chief Financial Officer, KPMG was uncertain as to whether it could continue to rely on management's representations.

***

**Item 8.01.      Other Events.**

On December 11, 2017, the Company issued a press release announcing the resignation of KPMG as the Company's independent registered public accounting firm and that the *Company will delay the filing of its Quarterly Report on Form 10-Q for the quarter ended October 31, 2017*. A copy of the press release is attached hereto as Exhibit 99.1 to this Current Report on Form 8-K and is incorporated herein by reference.

[Emphasis added].

31.    On this news, shares of the Company fell $0.80 per share, or more than 6 percent, from its previous closing price to close at $11.15 per share on December 11, 2017, further damaging Plaintiff and other members of the Class.

32.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

**Post Class Period Developments**

33.    On December 13, 2017, Bloomberg published an article entitled "Liberty Tax Sec

Scandal Draws Investor Suit Targeting Hewitt." In relevant part, the Bloomberg article stated as

follows:

> A pension fund is asking a judge to order Hewitt to relinquish his
> controlling stake in the national tax-preparation service after an
> internal review found that while running the company, he had sex
> in his office and hired relatives of female employees with whom
> he'd had romantic relationships.
>
> ***
>
> The pension fund says that doesn't go far enough, claiming Hewitt
> is breaching his legal duties to shareholders.
>
> ***
>
> Hewitt's refusal to sell his stake has caused so much turmoil at the
> Virginia Beach-based firm that Liberty delayed an earnings release
> set for Dec. 6 and watched its auditor, KPMG, resign over Hewitt's
> continued involvement with the company, the asbestos workers'
> pension fund said in the suit.
>
> ***
>
> Liberty Tax has tumbled 15 percent since Sept. 5, the day before
> the company fired Hewitt as CEO without disclosing the reasons.[1]

34.    On December 19, 2017, Liberty Tax published a press release entitled "Liberty

Tax Service Receives Notice of Delinquent Filing." In relevant part, the press release stated as

follows:

> Liberty Tax, Inc. (NASDAQ:TAX), the parent company of Liberty
> Tax Service, announced today that, as a result of its failure to
> timely file its Quarterly Report on Form 10-Q for the fiscal quarter
> ended October 31, 2017 (the "Form 10-Q"), it has received a
> notice from Nasdaq that the Company is not in compliance with
> Nasdaq's continued listing rules under the timely filing criteria

---

[1] Jef Feely and Anders Melin, Liberty Tax Sex Scandal Draws Investor Suit Targeting Hewitt, available at
https://www.bloomberg.com/news/articles/2017-12-13/liberty-tax-sex-scandal-draws-investor-lawsuit-targeting-
founder (lasted visited January 12, 2018).

established under Nasdaq Listing Rule 5250(c)(1) of the Nasdaq rules.

\*\*\*

In addition, the Company is still in the process of engaging a new independent registered public accounting firm.

## **CLASS ACTION ALLEGATIONS**

35. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Liberty Tax during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

36. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

37. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

38.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

39.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.      whether Defendants' acts as alleged violated the federal securities laws;

b.      whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

c.      whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d.      whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

e.      whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period

f.      whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

g.      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

40.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

41.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.      Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.      the omissions and misrepresentations were material;

c.      the Company's securities are traded in efficient markets;

d.      the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

e.      the Company traded on the NASDAQ, and was covered by multiple analysts;

f.      the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

g.      Plaintiff and members of the Class purchased and/or sold the Company's securities between the time Defendants failed to disclose or

misrepresented material facts and the time true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

h.      Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

42.      Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

43.      Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Against All Defendants

44.      Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

45.      This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

46.      During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

47.     The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

48.     The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

49.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

50.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

51.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

52.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

53.     By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

**Violation of Section 20(a) of The Exchange Act**
**Against The Individual Defendants**

54.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

55.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

56.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

57.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

58.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which

comprise the primary violations about which Plaintiff and the other members of the Class complain.

59. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: January 12, 2018

**GLANCY PRONGAY & MURRAY LLP**

By:  *s/ Lesley F. Portnoy*
Lesley F. Portnoy (LP-1941)
230 Park Ave., Suite 530
New York, New York 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
Email:  lportnoy@glancylaw.com

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy
Robert V. Prongay
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

**HOLZER & HOLZER, LLC**
Corey D. Holzer
1200 Ashwood Parkway, Suite 410
Atlanta, Georgia 30338
Telephone: (770) 392-0090
Facsimile:  (770) 392-0029

*Attorneys for Plaintiff*

## CERTIFICATION OF NAMED PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

The undersigned declares, as to the claims asserted under the federal securities laws, that:

Plaintiff has reviewed the initial complaint filed in this action.

Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows:

Purchases:

| Name of Company | Date(s) Purchased | # Shares Purchased | Cost/Share |
|---|---|---|---|
| TAX | 12/3/2014 | 100 | 37.41 |
| | 3/3/2015 | 2 | 27.44 |
| | 3/4/2015 | 98 | 27.58 |
| | 9/1/2016 | 100 | 13.62 |

Sales:

| Name of Company | Date(s) Sold | # Shares Sold | Proceeds/Share |
|---|---|---|---|
| TAX | 12/13/2017 | 9 | 10.70 |
| | 12/21/2017 | 291 | 11.58 |

During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _26_ day of _Dec._, 2017 in _Cape Coral_ , _FL_ .
City          State

(Signature) X _Rose Mauro_

(Print Name) _ROSE MAURO_