UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

IN RE LIBERTY TAX, INC. SECURITIES
LITIGATION

-------------------------------------------------------------------X

NICHOLAS G. GARAUFIS, United States District Judge.



**MEMORANDUM & ORDER**

2:17-CV-07327 (NGG) (RML)

Lead Plaintiff IBEW Local 98 Pension Fund ("IBEW") brings this action against Liberty Tax, Inc. ("Liberty"); Liberty's former chief executive officer, John Hewitt; and Liberty's former chief financial officer, Kathleen Donovan. Plaintiffs allege that Liberty and its officers violated federal securities law by making a series of false and misleading statements and by omitting material facts pertaining to the company's internal controls, compliance efforts, and compensation paid to Hewitt. (Am. Compl. (Dkt. 38) ¶ 1.) The cruces of Plaintiffs' allegations are that Liberty, Hewitt, and Donovan fraudulently covered up Hewitt's wide-ranging misconduct as CEO and that this misconduct eventually caused Liberty's stock price to plummet. (Id. ¶¶ 1-16.) Defendants now move to dismiss Plaintiffs' Consolidated Amended Class Action Complaint ("Complaint") for failure to state a claim. For the reasons that follow, Defendants' motion to dismiss is GRANTED.

I.      **BACKGROUND**

   A.      **Factual Allegations**

   For the purposes of considering Defendants' motion to dismiss, the court accepts as true all factual allegations in the Complaint. See N.Y. Pet Welfare Ass'n v. City of New York, 850 F.3d 79, 86 (2d Cir. 2017), cert. denied sub nom., 138 S. Ct. 131 (2017). The court will supplement these allegations by taking judicial notice of Liberty's stock price when relevant. See Acticon AG v. China N. E. Petroleum Holdings Ltd., 692 F.3d 34, 37 n.1 (2d Cir. 2012).

1

IBEW represents a putative class of investors who purchased Liberty Tax securities from October 2013 through February 2018 (the "Class Period"). (Am. Compl. ¶¶ 1, 21.) Defendants are Liberty Tax, Inc.; John Hewitt, Liberty's former CEO; and Kathleen Donovan, Liberty's former CFO. (Id. ¶¶ 22-24.) Liberty is a Delaware corporation that offers tax preparation services in the United States and Canada primarily through franchise locations. (Id. ¶ 22)

Plaintiffs allege that Hewitt used his position as CEO and controlling shareholder of Liberty to inappropriately advance his romantic and personal interests. (Id. ¶ 42.) According to the Complaint, Hewitt dated female employees and franchisees. (Id.) He allegedly took these women with him on business trips, had sex with them in his office during work hours, and provided their friends and relatives with positions at Liberty. (Id.) Additionally, Hewitt held numerous Liberty functions at a restaurant that he personally owned. (Id. ¶¶ 63-67.) Hewitt engaged in this misconduct throughout the Class Period. (Id. ¶ 1.)

While this alleged misconduct was occurring, Liberty released multiple SEC filings and public statements touting its compliance efforts, disclosure procedures, and internal controls over financial reporting. (Id.) Plaintiffs identify Liberty's repeated statements about its disclosure procedures and internal controls as particularly misleading. (Id. ¶¶ 91-145.) In every annual (Form 10-K) and quarterly (Form 10-Q) report during the Class Period, Liberty stated that its "disclosure controls and procedures were effective." (See, e.g., id. ¶ 91.) Additionally, in 2014, Liberty stated that the company had made "improvements to [its] internal controls in the areas of staffing, policies and procedures, and training" and that its "internal control over financial reporting was effective." (Id. ¶ 91.)

Hewitt also addressed compliance in several quarterly earnings calls where he stated that fraud prevention was a "fundamental goal" of the company and that the company had "continued

2

to intensify . . . [its] compliance efforts." (Id. ¶¶ 111, 123.) Donovan signed some of Liberty's filings and, according to a confidential witness, spoke about her efforts to conceal Hewitt's misconduct as "spinning things for . . . [Wall] Street." (Id. ¶¶ 145, 203.)

Plaintiffs also allege that Liberty fraudulently omitted two significant pieces of information from various SEC filings made during the Class Period. (Id. ¶ 1.) First, they allege that Liberty omitted Hewitt's misconduct from the portion of its 10-K and 10-Q forms where the company was required to disclose any risks that were reasonably likely to adversely impact continuing operations. (Id. ¶¶ 147-49.) Second, they contend that Liberty omitted several types of perquisites that Hewitt allegedly received as CEO from the portion of its Definitive Proxy Statement (Form DEF 14A) that required the company to disclose his "other income." (Id. ¶¶ 150-51.)

Plaintiffs further allege that the hidden risk concealed by these misstatements and omissions eventually manifested and caused Liberty's stock price to plummet. (Id. ¶¶ 215-219.) To support this, Plaintiffs point to a series of Liberty's SEC filings (8-K Forms)[1] that they allege "partially revealed . . . or materialized" Liberty's fraud and caused significant drops in Liberty's stock price. (Id. ¶¶ 153-54, 156-57, 159-60, 162-63, 165-66, 168-69.) Each of these filings reported that Liberty prepared fewer tax returns or earned less income than expected that year. (Id.) Plaintiffs allege that these challenges were "caused by diminished productivity." (Id. ¶¶ 155, 158, 161, 164, 167, 170.)

Starting in 2016, Liberty's public filings also reported losses, increased costs, and increased debt. (Id. ¶¶ 162-69.) On September 2, 2016, the company released an 8-K form that

---

[1] According to the SEC website, "Form 8-K is the 'current report' [public] companies must file with the SEC to announce major events that the shareholders should know about." See Form 8-K, U.S Securities and Exchange Commission, http://www.sec.gov/fast-answers/answersform8khtm.html (last visited September 30, 2019). This form must be filed in addition to "the required annual reports on Form 10-K and quarterly reports on Form 10-Q." Id.

first reported losses and increased debt. (Id.¶ 162.) Donovan attributed these problems to "separation costs for a former executive" and "increased employee compensation and benefits." (Id.) On December 8, 2016, the company reported lower revenues, larger losses, increased costs, and increased debt. (Id. ¶ 165.) On June 14, 2017, Liberty filed another 8-K reporting increased costs and decreased net income. (Id. ¶ 168.) Plaintiffs allege that the losses, increased costs and debt, and decreased net income revealed in these three reports were caused by "unqualified John Hires[2] and other diversion of millions in Company money to further Hewitt's personal interests." (Id. ¶ 164; see also id. ¶¶ 167, 170.) Notably, each of these reports occurred before Hewitt was fired and before the press exposed Hewitt's misconduct. (Id. ¶ 174.)

On July 12, 2017, employees reported Hewitt to the company's ethics hotline. (Id. ¶ 37.) He was terminated from his position as CEO on September 5, 2017. (Id. ¶ 73.) Despite losing his position as CEO, Hewitt retained his ownership of all of Liberty's "Class B" shares, which allowed him to appoint the majority of Liberty's board of directors. (Id. ¶ 80.) On November 6, 2017, he removed and replaced two members of the board. (Id. ¶ 82.) The following day, Donovan resigned. (Id. ¶¶ 171-172.) On November 9, 2017, The Virginian-Pilot newspaper published a report revealing Hewitt's misconduct to the public. (Id. ¶ 174.) That same day, Liberty filed a Form 8-K announcing that John Garel, an independent board member, would not seek reelection to the board. (Id. ¶ 175.) On November 13, 2017, Liberty filed his resignation letter, which confirmed that the details in the Pilot article were based on "credible evidence." (Id. ¶ 176.) On both November 9 and November 13, Liberty shares increased in value over the course of the day. (Decl. of Jeffrey B. Korn ("Korn Decl.") (Dkt. 50-2) at ECF p. 559, 561.)

---

[2] Plaintiffs allege that the HR department at Liberty used this term to refer to some of the people Hewitt hired, notably the friends and family of Hewitt's paramours. (Am. Compl. ¶ 45.)

Plaintiffs' allegations chronicle further setbacks for Liberty that occurred after November 13, 2017, including the resignation of KPMG as its independent auditor, and further turnover on the board and in management. (Am. Compl. ¶¶ 177-93.) This turmoil reversed the slight gains made in November and Liberty's stock experienced a sustained decrease in value thereafter. (Id. ¶¶ 177-200.)

Plaintiffs' amended complaint alleges three causes of action based on violations of federal securities law. (Am. Compl. ¶¶ 227-41.) First, the amended complaint alleges that Defendants committed fraud in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5. (Id. ¶¶ 227-31.) Second, it alleges that Defendants failed to furnish the requisite information in connection with a proxy solicitation in violation of Section 14(a) of the Exchange Act and SEC Rules 14a-3 and 14a-9. (Id. ¶¶ 232-38.) Finally, the amended complaint alleges that Hewitt and Donovan are individually liable for the foregoing violations as controlling persons within the meaning of Section 20(a) of the Exchange Act. (Id. ¶¶ 239-41.)

## B. Procedural History

Plaintiff Patrick Beland filed the initial complaint in this case on December 15, 2017. (Compl. (Dkt. 1).) Plaintiff Rose Mauro filed her complaint on January 12, 2018. (See Compl. (Dkt. 1), Mauro v. Liberty Tax, Inc. et al, No. 18-CV-245 (NGG) (RML) (E.D.N.Y. Jan. 12, 2018).) On February 13, 2018, Plaintiffs Mauro, Beland, and IBEW filed separate motions to consolidate the cases and appoint lead plaintiff and counsel. (See Mauro Mot. to Consolidate and Appoint Lead Counsel (Dkt. 10); Beland Mot. to Consolidate and Appoint Lead Counsel (Dkt. 13); IBEW Mot. to Consolidate and Appoint Lead Counsel (Dkt. 15).) On March 8, 2018, the court issued an order consolidating the cases under the current caption and appointing IBEW

lead plaintiff. (Order Consolidating Cases, Appointing Lead Plaintiff, and Approving Selection of Counsel (Dkt. 29).)

On June 12, 2018, IBEW filed the Consolidated Amended Class Action Complaint. (Am. Compl.) On September 17, 2018, Defendants served a motion to dismiss the amended complaint for failure to adequately plead a violation of the federal securities laws under Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4. (Defs. Mot. to Dismiss ("Mot.") (Dkt. 50) at 1.) The fully briefed motion was filed on November 27, 2018. (See Pl. Mem. in Opp. of Mot. to Dismiss ("Opp'n.") (Dkt. 50-9); Defs. Reply in Supp. of Mot. to Dismiss ("Reply") (Dkt. 50-11).)

## II.    LEGAL STANDARD

A motion to dismiss under rule 12(b)(6) tests the legal adequacy of the Plaintiff's complaint. To survive a 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In considering the sufficiency of the amended complaint, the court will "accept[] all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). However, the court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Iqbal, 556 U.S. at 678.

"In an Exchange Act case," a court "appl[ies] a heightened pleading requirement imposed by the [PSLRA], and Federal Rule of Civil Procedure 9(b), which requires a plaintiff to state with particularity the circumstances constituting fraud." Altayyar v. Etsy, Inc., 731 F. App'x 35, 37 (2d Cir. 2018) (summary order) (citation and quotation marks omitted). The PSLRA requires

that complaints alleging violations of the Exchange Act involving misstatements or omissions

"specify each statement alleged to have been misleading, the reason . . . why the statement is

misleading, and, if an allegation regarding the statement or omission is made on information and

belief, the complaint shall state with particularity all facts on which that belief is formed."

15 U.S.C. § 78u-4(b)(1). Furthermore, the PSLRA requires that complaints plead scienter by

"stat[ing] with particularity facts giving rise to a strong inference that the defendant acted with

the required state of mind." 15 U.S.C. § 78u-4(b)(2). In determining whether there is such a

strong inference, courts must determine whether a reasonable person would deem the inference

"at least as compelling as any opposing inference one could draw from the facts alleged." In re

Express Scripts Holdings Co. Sec. Litig., 773 F. App'x 9, 14 (2d Cir. 2019) (summary order)

(quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007)).

## III.    DISCUSSION

Plaintiffs assert claims under Section 10(b), Section 14(a), and Section 20(a) of the

Exchange Act. See 15 U.S.C. §§ 78j, 78n, 78t. To state a Section 10(b) claim, a plaintiff must

plausibly allege: "(1) a material misrepresentation (or omission); (2) scienter; . . . (3) a

connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss

causation." Singh v. Cigna Corp., 918 F.3d 57, 62 (2d Cir. 2019) (alterations adopted) (citation

omitted). To state a Section 14(a) claim, a plaintiff must plausibly allege that: "(1) a proxy

statement contained a material misrepresentation or omission, which (2) caused plaintiffs' injury,

and (3) the proxy solicitation itself, rather than the particular defect in the solicitation materials,

was an essential link in the accomplishment of the transaction." Bond Opportunity Fund v.

Unilab Corp., 87 F. App'x 772, 773 (2d Cir. 2004) (summary order). "In order to establish a

prima facie case of liability under § 20(a), a plaintiff must show: (1) a primary violation by a

7

controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation." Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998) (quoting S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996)).

Plaintiffs' claims under Section 10(b) or Section14(a) both require a material misrepresentation or omission and loss causation. The well-pleaded factual allegations of the Amended Complaint fail to establish either of these elements, and Plaintiffs therefore fail to state a claim under either 10(b) or 14(a). Since liability under Section 20(a) is dependent on a primary violation of the Exchange Act, see Boguslavsky, 159 F.3d at 720, Plaintiffs' Section 20(a) claim fails as well.

### A.    Material Misrepresentations and Omissions

#### 1.    Alleged Material Misrepresentations

To successfully allege a material misrepresentation, a plaintiff must plead facts that show that the defendant made a statement of material fact that was untrue at the time it was made. See In re Lululemon Sec. Litig., 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014), aff'd, 604 F. App'x 62 (2d Cir. 2015). A misrepresentation is material when there is a "substantial likelihood that a reasonable investor would find the misrepresentation important in making an investment decision." Steamfitters' Indus. Pension Fund v. Endo Int'l PLC, 771 F. App'x 494, 496 (2d Cir. 2019) (summary order) (alteration adopted) (quoting United States v. Litvak, 808 F. 3d 160, 175 (2d Cir. 2015)). Such misrepresentations "significantly alter the 'total mix' of information available" to investors. Singh, 918 F. 3d at 63 (quoting ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2009)). Plaintiffs allege several misrepresentations that they argue meet these criteria; each is discussed in turn.

a.   *Defendants' Risk Disclosure Concerning Hewitt's Control of the Board of Directors*

First, Plaintiffs allege that Defendants materially misrepresented the risks associated with Hewitt's control of the board of directors through his "Class B" shares.  (Am. Compl. ¶¶ 85, 89, 99, 113, 135.)  Throughout the Class Period, Liberty warned investors that Hewitt's "interests in our business may be different from those of our stockholders" and that Hewitt owned all of Liberty's "Class B" shares, allowing him to elect "a majority of the Board of Directors" and exert "significant influence over our management and affairs." (Id.)  Furthermore, Liberty explained that, given his level of control over the company, Hewitt "may make decisions regarding our Company and business that are opposed to other stockholders' interests."  (Id.) Plaintiffs argue that this repeated risk disclosure was a material misrepresentation because it represented the conflict between Hewitt's interests and those of the other Liberty shareholders as a mere possibility instead of, as Plaintiffs allege, a present reality.

In Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004), the Second Circuit held that "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." Id. at 173.  Applying this principle, courts in this circuit have held that a risk disclosure can itself be a material misrepresentation.  See In re Facebook, Inc. IPO Sec. & Derivative Litig., 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("[A] company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized."); see also In re Van der Moolen Holding N.V. Sec. Litig., 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005).  A risk disclosure is materially misleading when it is specific enough that a reasonable investor would rely on the risk disclosure as an assurance that a certain bad outcome has not already occurred. See In re FBR Inc. Sec. Litig., 544 F. Supp. 2d 346, 362 (S.D.N.Y. 2008).

Defendants' risk disclosures concerning Hewitt's control of Liberty are not material misrepresentations for at least two reasons. First, Hewitt's alleged misconduct is entirely unrelated to his control of the board. Plaintiffs allege several instances of misconduct that are contemporaneous with Liberty's disclosures about Hewitt's control of Liberty's Class B shares—e.g. that Hewitt hired unqualified persons, had sex in his office, expensed personal travel, and held Liberty events at the restaurant Hewitt owned (see Am. Compl. ¶¶ 86, 90, 100, 114, 136)—but none of that misconduct involved Hewitt using the voting power of his Class B shares to make a decision about the company that was against other shareholders' interest. (Id.) Because Hewitt's misconduct was unrelated to his control of the board, the risk disclosures pertaining to his ownership are not actionable material misrepresentations.

Second, the risk disclosures are too general for an investor to reasonably rely upon. Liberty warned that Hewitt might have opposing interests to other shareholders and that his control over the board might allow him to effectuate those interests. (Am. Compl. ¶¶ 85, 89, 99, 113, 135.) For a risk disclosure to constitute a material misrepresentation, it must mislead a "reasonable investor . . . about the nature of the risk when he invested." See In re FBR, 544 F. Supp. 2d at 362 (quoting Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 359 (2d Cir. 2002)). The risk disclosure here does not speak to any specific risk. It merely states that Hewitt's "interests in our business may be different from those of our shareholders" and that his decisions might be "opposed to other stockholders' interests." (Am. Compl. ¶ 85.) Given the level of generality, a reasonable investor would not rely on Liberty's risk disclosures as assurances that Hewitt, through his control of the board, was or was not making any particular decisions about the company.

b. *Defendants' Statements Regarding Internal Controls*

Next, Plaintiffs allege that Defendants made a series of material misrepresentations while discussing their internal controls and commitment to ethics in SEC filings and public statements. (Am. Compl. ¶¶ 91, 95, 97, 101, 105, 107, 109, 111, 115, 117, 121, 123, 125, 127, 129, 131, 133, 137, 139, 145.) Most of these statements were in SEC filings and stated that Liberty's management had "concluded that . . . the [c]ompany's disclosure controls and procedures were effective" and that Liberty's internal controls over financial reporting were effective based on specific accounting criteria. (Id. ¶¶ 91, 95, 97, 101, 105, 107, 109, 115, 121, 127, 131, 137, 145.) Among these filings, a single annual report stated that Liberty had implemented a "remediation plan [that] consisted of modifications and improvements to our internal controls in the areas of staffing, policies and procedures, and training." (Id. ¶ 91.) The remainder of these statements were assurances in SEC filings or quarterly earnings calls that Liberty was committed to ethics, standards, and compliance. (Id. ¶¶ 111, 117, 123, 125, 129, 133, 139.) Some of these assurances discussed the creation and success of a "Compliance Task Force," but most merely expressed Defendants' policy against fraud. (Id.) None of these statements are material misrepresentations.

As noted above, material misrepresentations must be untrue at the time that they were made and there must be a "substantial likelihood that a reasonable investor would find the . . . misrepresentation important in making an investment decision." Steamfitters' Indus. Pension Fund, 771 F. App'x at 496. If a misrepresentation is "too general to cause a reasonable investor to rely upon [it]," then it is inactionable "puffery." ECA & Local 134 IBEW Joint Pension Tr. of Chi., 553 F.3d at 206.

Here, Defendants' statements regarding Liberty's internal controls are puffery. "It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery.'" City of Pontiac Policeman's & Fireman's Ret. Sys. v. UBS AG, 752 F.3d 173, 183 (2d Cir. 2014). The most specific of Defendants' statements alleged by Plaintiffs is that Defendants had made "modifications and improvements to . . . internal controls in the areas of staffing, policies and procedures, and training." (Am. Compl. ¶ 91.) In C.D.T.S. v. UBS AG, No. 12-CV-4924 (KBF), 2013 WL 6576031 (S.D.N.Y Dec. 13, 2013), the court held that nearly identical statements were puffery. There, investors sued UBS after the bank lost $2.3 billion dollars on risky investments. See id., at *2. The investors argued that UBS made a material misrepresentation by claiming the firm's "internal control over financial reporting was effective," id., but the court held that this and related statements about the firm's effective risk controls were the kind of general positive comments that a reasonable investor would disregard and thus puffery. See id., at *2, *4-5.

Plaintiffs also advance two arguments that Defendants' statements regarding Liberty's compliance task force and policy against fraud were material misrepresentations. (See Opp'n at 18-90; see also Am. Compl. ¶¶ 111, 117, 123, 125, 129, 133, 139.) These arguments are unpersuasive.

First, Plaintiffs contend that these statements are not puffery because they are "anchored in misrepresentations of existing facts." In re Chi. Bridge & Iron Co. N.V. Sec. Litig., No. 17-CV-1580 (LGS), 2018 WL 2382600, at *8 (S.D.N.Y. May 24, 2018). As an example, they point to Hewitt's statement that the "compliance task force was very successful in analyzing, reviewing and evaluating the work of our compliance department and taking appropriate action to ensure that the standards of the Liberty brand are upheld and that those who do not uphold

Liberty standards are exited from the Liberty system." (Am. Compl. ¶ 125.) Plaintiffs claim that this statement is actionable because it misrepresented concrete steps that Liberty took. However, Plaintiffs do not allege that the task force failed to analyze, review, and evaluate Liberty's compliance department; instead Plaintiffs assert that the task force could not have been "very successful" because it failed to catch Hewitt's misconduct. (Id.) Hewitt's statement is puffery because it is a "simple and generic assertion[]" about the success of the task force and not a description of the task force's work in "confident detail." Singh v., 918 F.3d at 63-64; see also id. (holding that statement that firm would "continue to allocate significant resources" to compliance was not actionable).

Second, Plaintiffs rely on In re Electrobras Sec. Litig., 245 F. Supp. 3d 450 (S.D.N.Y. 2017) to argue that Defendants' statements regarding the compliance task force and Liberty's policy against fraud are actionable because they sought to reassure the public about Liberty's integrity. (See Opp'n at 18-19.) The relevant statements in Electrobras were made in response to press reports indicating that the company had engaged in money laundering. See Electrobras 245 F. Supp. 3d. at 463. Here, however, the statements at issue were all part of periodic, comprehensive reports on Liberty's well-being (Am. Compl. ¶¶ 111, 117, 123, 125, 129, 133, 139), and were not made to "quell a controversy or to lull a discontented investor or regulator." In re Braskem S.A. Sec. Litig., 246 F. Supp. 3d 731, 757 (S.D.N.Y. 2017). Consequently, these statements are not actionable.

c. *Defendants' Statement Regarding Hewitt's Successor*

Finally, Plaintiffs allege that Defendants' made a material misrepresentation when Liberty issued a press release stating that Hewitt had been terminated and that the company "had engaged in a deliberate succession planning process, which resulted in Ed Brunot joining the

Company as Chief Operating Officer as an interim step before assuming the role of CEO."

(Am. Compl. ¶ 143). Plaintiffs fail to successfully plead that this statement is a material

misrepresentation because they fail to allege its contemporaneous falsity. See Lululemon, 14

F.Supp. 3d at 571. While Plaintiffs allege that the press release did not explain why Hewitt was

terminated and that it suggested that his termination was related to succession planning (Am.

Compl. ¶ 144), this does not amount to alleging that the statement was false.

2.    Alleged Material Omissions

Plaintiffs next argue that Defendants failed to disclose Hewitt's misconduct under Item

303 of SEC Regulation S-K in violation of Section 10(b). (Id. ¶ 149). Plaintiffs also claim that

Defendants failed to disclose Hewitt's other compensation in connection with a proxy

solicitation in violation of Section 14(a). (Id. ¶ 151).

In order to allege a material omission, a plaintiff must plead facts that show that the

defendant omitted a fact that they either had a duty to disclose or that they needed to disclose to

prevent other statements from being misleading. See Stratte-McClure v. Morgan Stanley, 776

F.3d 94, 100-01 (2d Cir. 2015). Otherwise, "a corporation is not required to disclose a fact

merely because a reasonable investor would very much like to know that fact." Thesling v.

Bioenvision, Inc., 374 F. App'x 141, 143 (2d Cir. 2010) (summary order) (citing In re Time

Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993)).

a.    *Negative Trends under Item 303*

Plaintiffs allege that Defendants materially omitted Hewitt's misconduct from Liberty's

discussion of negative trends in its annual and quarterly reports. (Am. Compl. ¶¶ 147-149).

They contend that this omission was in violation of the disclosure requirements of Item 303 of

Regulation S-K and consequently establish a violation of Section 10(b).  See 17 C.F.R.

§ 229.303(a)(3)(ii).

Item 303 requires corporations to disclose "known trends or uncertainties" that are

reasonably likely to have a negative effect on their financial conditions or results of operations.

Id.; see also Stratte-McClure, 776 F.3d at 102.  The purpose of Item 303 is to "explain

irregularities in offering documents and prevent the company's last reported financial results

from misleading potential investors."  In re Noah Educational Holdings, Ltd. Sec. Litig., 08-CV-

9203 (RJS), 2010 WL 1372709, at *6 (S.D.N.Y. Mar. 31, 2010) (citing Lowinger v. Pzena Inv.

Mgmt., 341 F. App'x 717, 720 (2d Cir. 2009)).  In fact, the Second Circuit has only recognized a

failure to comply with Item 303 when a company has failed to disclose a trend that was about to

directly harm their operational results.  See Stratte-McClure, 776 F.3d at 97; Panther Partners

Inc. v. Ikanos Communications, Inc., 681 F.3d 114, 122 (2d Cir. 2012); Litwin v. Blackstone Gr.,

L.P., 634 F.3d 706, 721 (2d Cir. 2011).  In these cases, the management of each company knew

of and failed to disclose a clear trend that would soon directly harm their results of operations.  In

Stratte-McClure and Litwin, that trend was the impending financial crisis in 2006 and 2007.  See

Stratte-McClure, 776 F.3d at 97; Litwin, 634 F.3d at 721.  In Panther Partners, that trend was an

increasing number of complaints about defective chips from two customers who were

responsible for nearly three quarters of the defendants' revenue.  Panther Partners, 681 F.3d at

116.

Here, Plaintiffs do not plead that Defendants failed to disclose an adverse trend touching

on revenue from Liberty's tax preparation services.  Instead, they allege that Defendants should

have disclosed Hewitt's effect on spending, productivity, hiring, and company culture in Item

303 (Am. Compl. ¶ 149) and argue that Liberty was required to disclose Hewitt's misconduct

because it constituted the "plunder of millions from the company" and that he "devastat[ed] morale and [increased] turnover." (Opp'n at 21.) While this misconduct may have hurt the company, it is far afield from the actionable omissions mentioned above. See, e.g., Stratte-McClure, 776 F.3d 94. Hewitt's misconduct was not "extrinsic" or about the firm's "operational situation," see In re Canandaigua Sec. Litig., 944 F. Supp. 1202, 1211 (S.D.N.Y. 1996), and it also did not have a "tight[] nexus" to Liberty's revenue from tax preparation. Lopez v. Ctpartners Executive Search Inc., 173 F. Supp. 3d 12, 33-34 (S.D.N.Y. 2016). An actionable omission under Item 303 requires both.

More importantly, management did not need to report Hewitt's misconduct to clarify otherwise misleading reported financial results. See Canandaigua, 944 F. Supp. at 1210 (noting that the SEC guidance makes clear that Item 303 should be addressed to situations where reported financial information is not "necessarily indicative of future operating results or of future financial condition.") Hewitt's conduct as an executive, even if it comprised "plunder of millions from the company" (Opp'n at 21) is presumably reflected in Liberty's reported financials and is therefore not required to be disclosed via Item 303.

b.    *Compensation under Item 402*

Finally, Plaintiffs argue that six specific categories of alleged misconduct were perquisites that Liberty was required to disclose on Item 402 of Regulation S-K. (See Am. Compl. ¶¶ 150-151); 17 C.F.R. § 229.402. Item 402 requires disclosure of "perquisites and other personal benefits, or property, unless the aggregate amount of such compensation is less than $10,000." 17 C.F.R. § 229.402. Item 402 describes perquisites as a form of "other compensation" provided for "services rendered." See 17 C.F.R. § 229.402(c)(2)(ix)(A). To determine whether disclosure under Item 402 is required, the SEC requires companies to analyze

whether an expense item is "integrally and directly related to the performance of the executive's duties." 71 Fed. Reg. 53157, 53176. "If an item is integrally and directly related to the performance of the executive's duties, that is the end of the analysis—the item is not a perquisite . . . and no compensation disclosure is required." Id. at 53176-77. The SEC further explains that once an item has been determined to be related to an executive's duties, "there is no requirement to disclose any incremental cost over a less expensive alternative." Id at 53177.

The court is not aware of any in-circuit case law analyzing perquisites under Item 402. Outside of the circuit, one court concluded that perquisites must be awarded to and not "taken from a company." Andropolis v. Red Robin Gourmet Burgers, Inc., 505 F. Supp 2d 662, 685 (D. Colo. 2007). Another court held that a reimbursement or cost is only a perquisite when it pays for an executive's "private expenses." SEC v. Das, No. 10-CV-102, 2011 WL 4375787, at *7 (D. Neb. Sept. 20, 2011). According to the SEC, perquisites include the following:

> [C]lub memberships not used exclusively for business entertainment purposes, personal financial or tax advice, personal travel using vehicles owned or leased by the company, personal travel otherwise financed by the company, . . . and discounts on the company's products or services not generally available to employees on a non-discriminatory basis.

71 Fed. Reg. 53157, 53177. This case law and the SEC examples emphasize that extravagant business expenses are not perquisites simply because they are extravagant.

Plaintiffs argue that Hewitt's perquisites included (1) hiring friends and relatives of his lovers, (2) giving business loans and selling Liberty franchises to his girlfriends, (3) scheduling trips to cities where the New York Yankees were playing, (4) directing Liberty resources to his restaurant, (5) settling a hostile work environment lawsuit, and (6) charging the company for other lavish trips. (Am. Compl. ¶¶ 60, 151.) As an initial matter, while Defendants' hiring decisions, loans and franchise sales, transactions with Hewitt's restaurant, and lawsuit settlement

all may be questionable business decisions, they are not compensation that was "awarded to, earned by, or paid to" Hewitt. Andropolis, 505 F. Supp 2d at 685 (quoting 17 C.F.R. § 229.402).

Plaintiffs' allegations around Hewitt's travel provide the closest case of an undisclosed perquisite. Plaintiffs label Hewitt's trips as "vacations" and "weekend getaways" that were for his "personal entertainment," but also note that Hewitt always "scheduled a meeting with a franchisee or other company employee at the destination." (Am. Compl. ¶¶ 2, 60.) The business-related aspect of these trips distinguishes this case from Das, where an executive was reimbursed for $9.5 million of purely personal expenses. Das, 2010 WL 4615336, at *2. Presumably, meetings with franchisees or other employees are "integrally and directly related" to Hewitt's performance of his duties as CEO of Liberty, and, as such, Liberty was under no duty to disclose higher incremental travel expenses related to these meetings. 71 Fed. Reg. at 53177.

Plaintiffs concede that Hewitt always conducted at least some business on trips paid for by Liberty, but allege that Hewitt's business meetings on these trips were pretextual and that the actual purpose of the trips was Hewitt's "personal entertainment." (See Am. Compl. ¶¶ 60-62.) It is true that the perquisite analysis "draws a critical distinction between an item that a company provides because the executive needs it to do the job . . . and an item provided for some other reason, even where that other reason can involve both company benefit and personal benefit." 71 Fed. Reg. at 53177. However, Plaintiffs do not allege sufficient detail about Hewitt's many trips to support an inference that the business meetings he conducted on those trips were not integrally and directly related to Hewitt's performance of his duties as CEO. Therefore, Plaintiffs do not allege an actionable omission under Item 402.

Plaintiffs do not successfully allege material omissions under either Item 303 or Item 402 of SEC regulation S-K or, as explained above, material misrepresentations generally. Therefore, Plaintiffs do not establish a violation of either Section 10(b) or 14(a) of the securities laws.

**B.    Loss Causation**

Plaintiffs also fail to plead loss causation. A plaintiff may plead loss causation by alleging either that the market reacted negatively to a corrective disclosure of the fraud or that their loss was caused by the materialization of a risk concealed by the fraud. See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 232-34 (2d Cir. 2014). "[L]oss causation is not adequately pled simply by allegations of a drop in stock price following an announcement of bad news if the news did not disclose the fraud." See In re Gentiva Sec. Litig., 932 F. Supp. 2d 352, 384 (E.D.N.Y. 2013) (citation omitted). Instead, "loss causation rest[s] on the revelation of the truth." In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 262 (2d Cir. 2016). Plaintiffs must "disaggregate those losses caused by changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, from disclosures of the truth behind the alleged misstatements." Cent. States, Se. and Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp., 543 F. App'x 72, 76 (2d. Cir. 2013) (summary order) (quoting In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 36 (2d Cir. 2009)).

Here, Plaintiffs' attempt to establish loss causation by relying on diminished productivity and increased losses and debt reported on Form 8-K filings. (See Am. Compl. ¶¶ 153-161.) However, while Plaintiffs allege a causal connection between Hewitt's misconduct and the diminished productivity and increased losses and debt reported on the Form 8-K filings (id.), they do not allege that Liberty misstated or omitted anything about the company's performance in the past. Further, Plaintiffs cannot rely on allegations that Hewitt set a "damaging Tone at the Top" (Am. Compl. ¶ 158) to explain with particularity how the concealment of Hewitt's ethical lapses in Virginia caused independently run franchises across North America to process fewer tax returns. See Lentell v. Merrill Lynch & Co., 396 F.3d 161, 174 (2d Cir. 2005) ("[L]oss

causation has to do with the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant.") Therefore, the reports of diminished productivity and increased losses and debt do not amount to corrective disclosures that revealed "the truth about the company's underlying condition," Freudenberg v. E*Trade Fin. Corp., 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010) (quotation marks omitted), and do not establish loss causation.

Similarly, Plaintiffs contention that Donovan's resignation constructively disclosed Defendants' fraud (Am. Compl. ¶¶ 171-173) fails because Plaintiffs do not allege that Defendants made any misstatements or omissions that concealed the risk of Donovan's resignation. See In re Gentiva, 932 F. Supp. 2d at 384. Finally, Plaintiffs cannot rely on events that happened after Hewitt's misconduct was revealed to the market by the Virginian-Pilot article to establish loss causation because the disclosure of Hewitt's misconduct severs the causal connection between Liberty's alleged fraud and subsequent negative news about the company. See In re Omnicom Group, Inc. Sec. Litig., 597 F.3d 501, 512 (2d Cir. 2010) (finding no connection between defendants' fraud and events that occurred after the corrective disclosure that "added nothing to the public's knowledge").

Loss causation is a required element of a 10(b) and 14(a). See Singh, 918 F.3d at 62; Bond Opportunity Fund, 87 F. App'x at 773. Therefore, Plaintiff's failure to sufficiently allege loss causation provides an independently sufficient grounds for the dismissal of their 10(b) and 14(a) claims.

## C.    Plaintiffs' Claim Under Section 20(a)

For the reasons stated above, Plaintiffs have not sufficiently alleged a primary violation

of the securities laws.  Consequently, they cannot sufficiently allege a violation of Section 20(a).

See ECA, 553 F.3d at 206-07 (2d Cir. 2009).

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (Dkt. 50) is GRANTED.  The

Clerk of Court is respectfully DIRECTED to enter judgment for the Defendants and close the

case.


SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York            NICHOLAS G. GARAUFIS
       January 16, 2020              United States District Judge